IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| TIANA STANLEY, | ) |
| Plaintiff, | ) ) ) ) |
| -vs- | ) )  Case No. CIV-22-159-F |
| HENRY NENIEBARI WIFA and HALLIBURTON ENERGY SERVICES, INC., | ) ) ) ) ) |
| Defendants. | ) ) |

**ORDER**

Defendants' post-trial motions are before the court. They consist of defendants' Rule 50(b) motion for judgment as a matter of law (doc. no. 150) and their Rule 59(a) motion for new trial (doc. no. 151). Both motions have been fully briefed and are ripe for decision.

I.  The Rule 50(b) motion for judgment as a matter of law

This case arises from a car-truck accident that occurred on a rural Oklahoma road in September, 2019. Plaintiff was seriously injured in the accident. The claims that were submitted to the jury were claims of primary negligence on the part of the driver, Henry Wifa, and negligent entrustment on the part of the corporate defendant, Halliburton Energy Services, Inc. At the summary judgment stage, the court granted Halliburton's motion for summary judgment on plaintiff's negligent hiring claim but denied the motion for summary judgment as to the negligent entrustment claim. The court also declined, at the summary judgment stage, to grant summary judgment as to recoverability of punitive damages. Doc. no. 115. At trial, the court declined to

submit punitive damages but did submit the claims of primary negligence (*e.g.*, the driver's negligence) and negligent entrustment which remained for trial after consideration of the motion for summary judgment.

As an initial matter, it should be borne in mind that a motion for judgment as a matter of law in a case triable to a jury must be assessed on a stringent standard, favoring the non-movant. The motion should be granted only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position. Finley v. United States, 82 F.3d 966, 968 (10th Cir. 1996). The non-movant gets the benefit of "all reasonable inferences." *Id.* Thus, bearing that stringent standard in mind, it makes no difference that, as in this case, the verdicts of the judge would likely have been different than the verdicts reached by the jury. (As the undersigned observed at trial, this was not a compelling case of negligent entrustment.)

Another preliminary matter should be addressed. Halliburton accurately, albeit a bit selectively, quotes the court's brief comments when Halliburton's motion for judgment as a matter of law was denied at the end of the trial. Doc. no. 150, at 4. In so ruling, the court focused on Mr. Wifa's driving record. From this, Halliburton extrapolates that the court applied the wrong standard because it "did not consider or sufficiently consider" the issue of Halliburton's knowledge of Mr. Wifa's driving record. *Id.* at 14. The complete version of the court's ruling on the submissibility of the negligent entrustment claim is as follows:

> I address first the negligent entrustment claim. I have carefully listened to, evaluated, and considered the evidence in support of the negligent entrustment claim. Obviously, as counsel on both sides are well aware, I also carefully considered that evidence as it was then presented at the summary judgment stage. I adhere to my summary judgment ruling. I conclude that there is a fact issue *under the Oklahoma cases defining the scope of liability and the prerequisites to liability for negligent entrustment*. In my view, it is not a compelling case of negligent

2

entrustment, but I do find and conclude that it is a submissible case of negligent entrustment. So both negligent entrustment and, if you will, primary negligence of the driver will be submitted to the jury.

Doc. no. 150-2, at 3 (transcript p. 215) (emphasis added).

As was made clear at the summary judgment stage, the court was well aware of the elements of negligent entrustment under Oklahoma law:

> Liability for negligent entrustment of a motor vehicle may be imposed only when the following elements are shown: (1) a person who owns or has possession and control of a motor vehicle allowed another driver to operate the motor vehicle; (2) *the person knew or reasonably should have known that the other driver was careless, reckless and incompetent*; and (3) an injury was caused by the careless and reckless driving of the motor vehicle. Green v. Harris, 70 P.3d 866, 871 (Okla. 2003); *see also*, Sheffer v. Carolina Forge Co, LLC, 306 P.3d 544, 548 (Okla. 2013) ("Negligent entrustment of an automobile occurs when the automobile is supplied, directly or through a third person, for the use of another whom the supplier knows, or shown [sic] know, because of youth, inexperience, or otherwise, is likely to use it in a manner involving unreasonable risk of bodily harm to others, with liability for the harm caused thereby.") (citing Green, 70 P.3d at 868 n. 5); Fox v. Mize, 428 P.3d 314, 320 (Okla. 2018) ("Negligent entrustment requires proof that 'an individual supplies a chattel for the use of another whom the supplier knows or should know is likely to use the chattel in a way dangerous and likely to cause harm to others.'") (quoting Pierce v. Okla. Prop. & Cas. Ins. Co., 901 P.2d 819, 823 (Okla. 1995)).

Doc. no. 115 (summary judgment order), at 4 (emphasis added).

When Halliburton entrusted the truck to Mr. Wifa, it was obviously chargeable with knowledge of Mr. Wifa's driving record, as reflected in Halliburton's personnel file for Mr. Wifa. When evaluating a negligent entrustment claim, whether as a matter of law or in weighing conflicting evidence, it is logical, of course, to consider the seriousness of the previous incidents, the remoteness in time of those incidents, and the similarity of those incidents to the accident being

3

litigated. And the previous incidents are irrelevant if the employer had no knowledge of them (or was not otherwise chargeable with that knowledge).

Aside from speeding violations, which the court is content to ignore for present purposes, Halliburton's personnel file for Mr. Wifa reflected (i) a failure to yield, resulting in an accident in November, 2007, (ii) a failure to control speed resulting in an accident in February, 2014, (iii) a citation for unsafe speed resulting in loss of control on a Texas highway, including "derailing," in 2016, (iv) a U-turn incident on a two-lane highway in 2018 (16 months before the accident in this case), found by Halliburton to have amounted to "unacceptable performance," putting "not only your own safety at risk, but also the lives and safety of others," and resulting in a three-day suspension, and (v) deficiencies noted by Halliburton in several areas in 2017, including problems in the categories of "does not hit nearby vehicles or stationary objects" and "keeps right and in own lane," resulting in recommendation of a driving mentor. Doc. no. 159 (plaintiff's trial exhibit no. 6), at HESI 107, 118, 204, 226, 256, 297; doc. no. 158-2, at ECF 6 (transcript p. 65).

This record, assuredly, is not sufficient to subject Mr. Wifa or Halliburton to eternal damnation, but it is, in the court's view, sufficient to make the negligent entrustment claim submissible to the jury. The point here is that the egregiousness of the facts underlying the negligent entrustment claim can be argued either way– and that is precisely what makes the claim submissible to the jury. The court accordingly concludes that Halliburton's renewed motion for judgment as a matter of law, doc. no. 150, should be denied.

II. The Rule 59(a) motion for new trial

    A. Introduction

Defendants move for a new trial under Rule 59(a), arguing that the court allowed plaintiff's treating physician, Dr. Scott de la Garza, to cover more ground in his trial testimony than should have been permitted from a treating physician and

that the defendants were thereby prejudiced. An understanding of what happened, and why, requires a review of relevant events before and during the May, 2023 trial.

B. The sequence of events through trial

1. Plaintiff's witness list

Plaintiff filed her final witness list on January 10, 2023. Unsurprisingly, she listed Dr. de la Garza as a witness. The witness list described his anticipated testimony as follows: "Scope of Plaintiff's injuries and treatment from subject accident; pre-accident medical history to affected parts of Plaintiff's body; prospective medical treatment and estimated cost thereof." Doc. no. 45.

2. The March 17 order re: scope of Dr. de la Garza's testimony

On February 1, defendants filed a motion in limine seeking to restrict the scope of Dr. de la Garza's testimony, arguing that, since his "expert opinions and testimony" had not been disclosed as required by Rule 26(a), the court should "exclude or preemptively preclude the presentation of improper expert opinions at the trial in this matter." Doc. no. 53, at 7. Thus, the motion presented the oft-recurring (and often vexing) problem of how far a treating physician–obviously an expert–should be permitted to go in testifying about matters relating to the patient's injuries. On March 17, the court entered an order on the motion in limine, effectively granting the motion in part, defining the limits of Dr. de la Garza's testimony. As relevant here, that order said:

> Dr. de la Garza has not been disclosed as an expert witness pursuant to Rule 26(a)(2)(A), Fed. R. Civ. P. Consistent with that, Dr. de la Garza has not rendered an expert report pursuant to Rule 26(a)(2)(B), and no Rule 26(a)(2)(C) summary disclosure has been made. Consequently, Dr. de la Garza will not be available to plaintiff as a source of Rule 702 expert testimony. The court must accordingly determine, within that constraint, the permissible scope of Dr. de la Garza's trial testimony.

Doc. no. 83, at 1-2.

After discussing Rules 701 and 702 of the Federal Rules of Evidence and Rule 26 of the civil rules, the court discussed the treatment of this issue by Judge Browning of the District of New Mexico:

> [T]he court does note the exhaustive treatment given this problem by Judge Browning, of the District of New Mexico, in Walker v. Spina, 2019 WL 145626 (D.N.M. Jan. 9, 2019). As might be expected, the court's beginning point in Walker was the proposition that "[i]f a treating physician testifies as an expert witness, the testimony's proponent must disclose the treating physician as an expert and produce an expert report, or a summary of the expert's subject matter and the proposed testimony." *Id.* at *17 (citing Rule 26(a)(2)(B) and (C)). But "[a]fter the 2000 amendments, a treating physician still acts as a lay witness when testifying to his treating or caring for a patient." *Id.* at *19. Further treatment of this issue (treatment with which the undersigned agrees) appears in the Walker v. Spina decision at *21, *et seq.*
>
> \*   \*   \*
>
> Taking into account the language of Rules 701 and 702, as applied to treating physician testimony in various contexts, it remains true that in situations in which no Rule 26(a)(2)(B) expert report has been rendered and no Rule 26(a)(2)(C) summary disclosure has been made, the line between permissible and impermissible testimony from a treating physician will sometimes be difficult to draw.
>
> \*   \*   \*
>
> Bearing all of these matters in mind, the court concludes, on the basis of the facts presented by this motion, that it will be permissible for Dr. de la Garza to testify as to: (i) his *clinical observations as to the nature and extent of plaintiff's injuries (both initially and as her condition evolved over time)*, (ii) the *history given by Ms. Stanley (including her version of causation*), (iii) the treatment he provided, (iv) the reasons for the treatment he provided, (v) the pain or physical limitations reported by Ms. Stanley or clinically observed by Dr. de la Garza at various stages of his treatment of her, (vi) future treatment he has actually recommended, and (vii) *other objectively observable facts, even if Dr. de la Garza's medical expertise helps make his description more understandable.*

> Off limits, for lack of a Rule 26(a)(2)(B) expert report or a Rule 26(a)(2)(C) summary disclosure, will be testimony as to prospective medical treatment that Dr. de la Garza has not actually recommended and his estimate of the cost of future medical treatment (whether or not he has recommended it).

*Id.* at 2-4 (emphasis added).

Defendants never took issue with this delineation of the permissible scope of Dr. de la Garza's testimony. In fact, they have acknowledged that "those seven topics [quoted above] are consistent with precedent." Doc. no. 151, at 19, n. 8.[1]

After the court entered its March 17 order, and as a precautionary measure, lest Dr. de la Garza's knowledge (and resulting trial testimony) be tainted with foreknowledge of the anticipated testimony of defendants' medical expert, Dr. Alexander L'Heureux, plaintiff's counsel retrieved from Dr. de la Garza, before he had reviewed them, the "report and exhibits" generated by Dr. L'Heureux. Doc. no. 129-1. As is common with testimony from treating physicians, the trial testimony of Dr. de la Garza was presented via a video trial deposition. He gave his deposition testimony on April 28. That testimony was presented at trial on May 10 (one of nine witnesses to testify that day). Doc. no. 139.

      3. <u>The challenged testimony</u>

As required by chambers rules, where a party intends to present deposition testimony at trial, the parties designated and counter-designated Dr. de la Garza's proposed trial testimony and lodged their objections to the opposing parties' designations. Defendants' brief in support of their motion for new trial complains of "improper admission of opinion testimony from Dr. de la Garza," doc. no. 151, at 2, consisting of four questions and four answers as to which their objections to Dr.

---

[1] In light of the important matters encompassed by these seven topics, it seems odd that defendants suggested, in their brief for a new trial, that it "seemed doubtful" that Dr. de la Garza would even be called to testify. Doc. no. 151, at 5.

7

de la Garza's testimony were overruled.  *Id*. at 1, 8-9.  Those four questions and answers were:

> Q   And what was the nature of the injury that were [sic] causing her symptoms?
>
> A   Well, the nature of the injury, and I believe you are alluding to causation, is she had not had any of these symptoms before the motor vehicle accident.  She had all of these symptoms after the motor vehicle accident.[2]
>
> _____
>
> Q  Okay.  All right.  And just to ensure that we have got your – your opinions very clear for our jury, Doctor, what do you – what do you believe, within a reasonable degree of actual medical certainty, what the cause was for Tiana Stanley's chronic neck and radicular pain into her right arm by the time she got to you?
>
> A   I think causation was very clear that she had a singular incident that was the etiology of her right radicular symptoms.[3]
>
> _____
>
> Q   And do I recollect your earlier testimony, in response to Ms. Hopper's questions, that would be consistent with a high-impact collision?
>
> A   That would be consistent with an injury, very much so, those radiographs, in my opinion.
>
> Q   Would that type of injury be consistent with a very low-speed impact?
>
> MS. HOPPER:  Objection, leading.
>
> THE WITNESS:  It wouldn't be typical.[4,5]

---

[2] Doc. no. 151-2, at 30, lines 5-11.
[3] *Id*., at 51, line 19 through pg. 52, line 3.
[4] *Id*., at 83, line 24 through pg. 84, line 7.
[5] In their brief for a new trial, defendants state that "during the trial, Defendants objected to the admission and publication of [Dr. de la Garza's] testimony."  Doc. no. 151, at 19.  Actually, what defendants did was "reurge our motion to strike Dr. de la Garza for the reasons previously set forth in our motion to strike."  Doc. no. 151-5, at 150.  That motion to strike, filed shortly after the

The centerpiece of defendants' argument for a new trial on the basis of the court's admission of these questions and answers is their contention that "[t]he jury heard Dr. de la Garza, under a guise of neutrality, testify that [plaintiff's] claimed damages were solely and singularly caused by the subject accident, and consistent 'with a high-impact collision.'"  Doc. no. 151, at 9.  Defendants' point was that the plaintiff had been in other accidents, raising a question as to the extent to which plaintiff's spinal injury was caused by the 2019 collision with the Halliburton truck.  Doc. no. 151, at 6.  For that reason, it should be borne carefully in mind that, elsewhere in his testimony, Dr. de la Garza readily acknowledged that, in evaluating the effect of an unrelated collision, he would "unequivocally" need "more information about that collision."  Doc. no. 151-2, at 77.  This would include knowledge as to "what type of a collision we're talking about."  *Id*. at 71.  And as to a 2021 collision that defendants emphasized at trial, Dr. de la Garza agreed that he would "absolutely say, yes, I would need some more information" to evaluate whether that collision could "impact [his] opinions with regard to medical causation."  Doc. no. 129-2, at 75.  In other words, defendants' trial advocacy was not just aided by the testimony of Dr. L'Heureux–the last witness the jury heard from–to the effect that the collision with the Halliburton truck was the sole cause of plaintiff's injury, it had the benefit of Dr. de la Garza's repeated acknowledgement that he would have to have more information before he could definitively weigh in on the issue of whether the accident being litigated was the sole cause.

    4. The trial

The jury trial began on May 9 and went to verdict on May 12.  The court submitted the negligence and negligent entrustment claims to the jury, but declined

---

completion of Dr. de la Garza's video trial deposition, raised only the relatively narrow issue of whether Dr. de la Garza should be excluded altogether as a witness because he had received information about the plaintiff, and the case in general, from her lawyer.  Doc. no. 129, at 3-4.

9

to submit punitive damages. The verdict in favor of the plaintiff apportioned 85 percent of the fault for the accident to the defendants and fifteen percent to the plaintiff.

C. <u>The legal standard</u>

Defendants argue that the court erred (i) by permitting Dr. de la Garza to give the testimony quoted above and (ii) in not performing its <u>Daubert</u> gatekeeping function with respect to Dr. de la Garza's testimony.

As for the standard governing the admission of Dr. de la Garza's testimony, defendants state:

> Decisions on the admissibility of evidence generally stand unless there is a "definite and firm conviction that the [ ] court made a ***clear error of judgment or exceeded the bounds of permissible choice in the circumstances***." <u>Stroup v. United Airlines, Inc.</u>, 26 F.4th 1147, 1168 (10th Cir. 2022) (citation omitted) (emphasis added). A clear error of judgment justifies a new trial if it "prejudicially affects a substantial right of a party." <u>Weaver v. Blake</u>, 454 F.3d 1087, 1091 (10th Cir. 2006) (quoting <u>Hinds v. Gen. Motor [sic] Corp.</u>, 988 F.2d 1039 (10th Cir. 1993)). *See also* <u>Bridges v. Wilson</u>, 996 F.3d 1094, 1099 (10th Cir. 2021) ("[a]n error affecting a substantial right of a party is an error which had a substantial influence or which leaves one in grave doubt as to whether it had such an effect on the outcome") (quoting <u>Hill v. J.B. Hunt Transp., Inc.</u>, 815 F.3d 651 (10th Cir. 2016)). "Evidence admitted in error can only be prejudicial if it can be reasonably concluded that with or without such evidence, there would have been a contrary result." *Id.* (citation omitted).

Doc. no. 151, at 2-3 (footnotes omitted).

The court has no reason to quibble with that articulation of the standard (nor does plaintiff), so no further discussion is needed.

As for the <u>Daubert</u> issue, the court, likewise, does not take issue with defendants' contention that the gatekeeping duty is mandatory *if* the issue really is a <u>Daubert</u>/Rule 702 issue and the request for <u>Daubert</u> scrutiny is timely made.

10

D. Conclusion as to the motion for new trial

   1. Admission of the testimony at issue

Defendants' complaint about the admission of the testimony at issue is based on asserted violations of Rule 37 and the court's March 17 order (quoted at length on pp. 5-7, above). *See*, doc. no. 151, at 15 (citing "Fed. R. Civ. P. 37 and the Order").

Defendants did not invoke the preclusive sanction of Rule 37(c) (or, for that matter, any other subdivision of Rule 37) in their motion in limine, doc. no. 53, in their motion to strike, doc. no. 129, or at trial. That said, in the present context, the Rule 37(c) harmlessness standard (focusing on the harmlessness of a litigant's failure to disclose) focuses on the same underlying issues, and entails a standard no more demanding, than the up-or-down question of whether the court should have admitted the challenged testimony at all. The court will accordingly address the issues as to the admission of the testimony in question under the "clear error of judgment" standard quoted (with some elaboration) above.

To review how we got here, the relevant part of the March 17 order permitted testimony from Dr. de la Garza as to the following matters that are especially relevant now:

- His "clinical observations as to the nature and extent of plaintiff's injuries (both initially and as her condition evolved over time)."
- The "history given by Ms. Stanley (including her version of causation)."
- "[O]ther objectively observable facts, even if Dr. de la Garza's medical expertise helps make his description more understandable."

*See*, p. 6, above.

And as has been noted, defendants did not take issue with the limits specified in the March 17 order when it was entered, nor do they now. Doc. no. 151, at 19, n. 8.

11

The first question and answer

The only substantive testimony given by Dr. de la Garza in response to the first question was: "she [plaintiff] had not had any of these symptoms before the motor vehicle accident. She had all of these symptoms after the motor vehicle accident."[6]

To be sure, this answer from plaintiff's treating physician was clearly at odds with defendants' theory of the case. And the factual account given to the physician by the patient in a clinical setting may or may not have been accurate. But there is nothing remarkable about allowing a treating physician to recount his patient's presenting symptoms–including her version of why she had those symptoms. More to the present point, this statement, though consistent with plaintiff's theory of causation, and though coming from a physician, is not an expression of expert opinion.

The second question and answer

The second question went directly to the medical cause of the pain in plaintiff's neck and right arm. The treating physician's answer: "I think causation was very clear that she had a singular incident that was the etiology of her right radicular symptoms."[7] Two points are important here. First, this was direct examination. As has been noted (p. 9, above), defendants very effectively elicited, on cross-examination, Dr. de la Garza's forthright acknowledgement that he would need more information about plaintiff's other collisions before he could really say whether this accident was the sole cause of plaintiff's injury. Second, it is clear, in the context of the rest of Dr. de la Garza's testimony on direct, that this was his clinical observation, well within the bounds of the March 17 order ("observations as to the nature and extent of plaintiff's injuries," and "history given by Ms. Stanley

---

[6] See p. 8, above.
[7] Id.

12

(including her version of causation)." A narrower reading of the March 17 order would also have been permissible. But the court is satisfied that this judgment call–overruling an objection to this question–did not "exceed[] the bounds of permissible choice in the circumstances" and did not "prejudicially affect[] a substantial right of" defendants (p. 10, above). The jury was in an excellent position, with the benefit of defendants' array of experts on the issue of causation (including a biomechanical expert, an accident reconstructionist, and Dr. L'Heureux), to reach its conclusion on the issue of causation, all with a full understanding of defendants' theory and the factual as well as the technical bases for that theory.[8]

The third and fourth questions and answers

In responding to the third and fourth questions, Dr. de la Garza confirmed that plaintiff's injury was consistent with a high-impact collision ("very much so," based on the radiographs) and would not be typical of a "very low-speed impact."[9] Two things are dispositive of defendants' complaint here. First, Dr. de la Garza did not present himself as an accident reconstructionist, which is to say that he did not testify that this *was* a high-impact collision. He went no further than to say that plaintiff's injury and the resultant neck pain was consistent with a high-impact collision. For his part, Dr. L'Heureux, defendants' medical expert, said plaintiff's pain was more likely due to pre-existing problems, but even he didn't go so far as to say that plaintiff's injury–which he described as possibly "a mild to moderate strain of the

---

[8] Defendants complain repeatedly about plaintiff's counsel's description of Dr. de la Garza as a "rock star." Doc. no. 151, at 14, 15; doc. no. 162, at 2, 5, 8. Regardless of whether a witness is an expert, his credibility is at least potentially in play. Plaintiff's counsel was perfectly entitled to argue, with colorful rhetoric or otherwise, that Dr. de la Garza was worthy of belief. To the extent that the "rock star" description might be regarded more narrowly as an attempt to bolster the doctor's expertise, his expertise was potentially at issue even as to matters unquestionably within bounds for the testimony of a treating physician.

[9] See p. 8, above.

cervical musculature in her neck[10]–couldn't have been caused by a high-impact collision. Second, Dr. de la Garza's "consistent with a high-impact" characterization was, by any reasonable standard, within the realm of "his clinical observations as to the nature and extent of plaintiff's injuries," the "history given by Ms. Stanley (including her version of causation)," and "other objectively observable facts, even if Dr. de la Garza's medical expertise helps make his description more understandable."

———————————————————

Finally on this subject, and in fairness to the defendants, it might also be appropriate to look at the collective effect of these four questions and answers rather than parsing them one-by-one. Collectively, they would contribute to an inference by the trier of fact–subject to argument pro or con, like any other inference–that it was the collision with the Halliburton truck that caused plaintiff's spinal injury. But, in the court's view, Dr. de la Garza did nothing more than provide the treating physician's piece of that puzzle.[11] That is what car and truck wreck litigation is usually all about.

Calling balls and strikes on Dr. de la Garza's testimony required some judgment calls. The court is not critical of defendants for arguing (unsuccessfully) that the court allowed Dr. de la Garza to say too much.[12] But it is telling that if Dr. de la Garza's testimony made a difference at all (even after he acknowledged on

---

[10] Doc. no. 146-2, at transcript p. 421. Dr. L'Heureux also acknowledged that this collision caused shoulder bruising, an abrasion from the lap belt, and a bruise on plaintiff's right ankle. *Id.*

[11] The court also cannot but note that if defendants wanted to find out what plaintiff's treating physician had to say about that piece of the puzzle, they could have taken his deposition long before plaintiff took his testimony by video trial deposition a few days before the trial began. As a practical matter, the fact that defendants didn't take the treating physician's deposition has a lot to do with why this whole set of issues is even before the court.

[12] On pp. 2 and 5 of plaintiff's response, doc. no. 160, she cites and quotes from district court cases addressing the permissible scope of treating physician testimony. The court generally agrees with those decisions, but it is not necessary to get into an analysis of them here.

cross examination that he would need more information to definitively speak to causation), it made that difference in the face of an array of experts (as noted, an accident reconstructionist, a biomechanical expert and an orthopedic surgeon), all lined up in opposition to plaintiff's theory of causation. The point here is that defendants plainly availed themselves of the opportunity to mount an all-out contest in front of the jury on the issue of causation. The court is well-satisfied that this case went the way it did because the jury was persuaded by plaintiff's account of the basic underlying facts, and not because of the effect, if any, of four answers to four questions. "Prejudice," in this context, consists of the denial of a fair opportunity to litigate an issue. Defendants were not prejudiced.

      2. Lack of evaluation of Dr. de la Garza's testimony under Daubert

Defendants' last argument is that the court erred in failing to subject Dr. de la Garza's testimony to scrutiny under Daubert and Rule 701. Doc. no. 151, at 20-22. Defendants' argument is that the court abandoned its gatekeeping function altogether. *Id.* at 20. The problem here is that defendants never sought Daubert scrutiny from the court.

The court is not critical of defendants for not having filed a Daubert challenge. Relying on the court's March 17 order, they had no reason to do so. Correspondingly, the real issue here does not arise from the fact that the court did not rule on a Daubert challenge that was never filed. That said, it should be noted that Dr. de la Garza's qualifications are unchallenged (and, indeed, are acknowledged by defendants, doc. no. 151, at 7). Dr. de la Garza is an extremely experienced orthopedic surgeon. Save for some very general information he had about plaintiff's other accidents, his trial testimony was rooted in his clinical observations as plaintiff's treating physician and was well within the realm of his uncontested expertise. Daubert screening can be performed post-trial if necessary. Goebel v. Denver & Rio Grande W. R.R. Co., 215 F.3d 1083, 1087 (10th Cir. 2000).

15

It is tempting to do that now, but, in light of (i) the absence of a request for <u>Daubert</u> scrutiny before trial, and (ii) the court's conclusions on other dispositive aspects of defendants' motion, it is not necessary to do so.

## CONCLUSION

For the reasons stated above, the defendants' Rule 50(b) motion for judgment as a matter of law (doc. no. 150) and their Rule 59(a) motion for new trial (doc. no. 151) are **DENIED**.

IT IS SO ORDERED this 29th day of September, 2023.

_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

22-0159p031.docx